COMMONWEALTH *vs.* BOSTON TRANSCRIPT COMPANY.

Suffolk.   January 18, 1924. — June 12, 1924.

Present: RUGG, C.J., DeCOURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Minimum Wage. Constitutional Law*, Right to contract. *Corporation*, Amendment of charter by general law. *Newspaper.*

Section 12 of G. L. c. 151, is not in terms permissive but is penal, and purports to require the publisher of any newspaper, without negotiation and without choice on his part, to print specified matter offered to him by the minimum wage commission at the regular rate charged by him to the general public for the space taken by the publication.

The protection afforded by G. L. c. 151, § 13, against liability for libellous publications made pursuant to the mandate of § 12 is of uncertain nature.

Section 12 of G. L. c. 151, curtails in substantial particulars the right of the publisher of a newspaper to contract about his own affairs, is not enacted for a temporary emergency and limited in time, but is permanent in scope and operation, and is unconstitutional.

Section 12 of G. L. c. 151, cannot be supported as an amendment to the charter of a Massachusetts corporation which is the publisher of a newspaper.

Upon a report by a judge of the Superior Court of a complaint alleging a violation of G. L. c. 151, § 12, on the part of a newspaper corporation which had refused to print a decision submitted to it by the minimum wage commission, it was *held*, that

(1) It could not be said that newspapers are affected with a public interest so as to stand on a less favorable ground than an ordinary person with respect to legislative regulation like that here involved;

(2) The case did not fall within the principle of lawful impressment for public service.

Sections 12 and 13 of G. L. c. 151 are unconstitutional; but their invalidity does not affect the rest of G. L. c. 151, which stands as a valid exercise of legislative power.

COMPLAINT, received and sworn to in the Municipal Court of the City of Boston on May 25, 1923, charging that the defendant did without lawful excuse refuse to publish in its newspaper at its regular rates for space taken therefor a certain finding by the minimum wage commission which had been sent to it to be published on May 14, 1923.

On appeal to the Superior Court, the defendant filed a motion to quash on the following grounds:

" 1. If by the true construction of G. L. c. 151, § 12, the punishable offence is the refusal or neglect of a newspaper to publish the findings, decrees or notices of the minimum wage commission at the regular rates, the offence being in the charging or attempting to collect or the demand for something in excess of regular rates, then the complaint is defective in not containing any allegation or charge as to the rates charged, demanded, or attempted to be collected by the defendant.

" 2. If by the true construction of G. L. c. 151, §§ 12, 13, the intent and purpose of those sections is to punish any newspaper for refusing or neglecting to publish any findings, decrees or notices of the minimum wage commission, as re-

quested or demanded by it, then those sections are unconstitutional and void, being in violation of the Declaration of Rights of the Constitution of Massachusetts, art. 1, 10, 12, and the Fourteenth Amendment of the Constitution of the United States."

The motion to quash the complaint was heard by *Dubuque*, J., and was overruled. The facts were then agreed upon by the parties. Material facts are described in the opinion. The defendant, on the agreed facts, moved that a verdict of not guilty be ordered on the ground that G. L. c. 151, §§ 12, 13, under which the complaint was brought, were " null and void as in violation of the Constitution of Massachusetts and of the Constitution of the United States." The motion was denied. The jury found the defendant guilty. The trial judge reported the case for determination by this court.

*H. P. Fielding,* Assistant District Attorney, *& J. G. Palfrey,* (*F. S. Deland,* Assistant District Attorney, with them,) for the Commonwealth.

*F. Rackemann,* for the defendant.

*E. A. Whitman,* for Post Publishing Company, submitted a brief as *amicus curiæ.*

RUGG, C.J. The defendant is charged with having refused to publish at its regular rates a finding by the minimum wage commission. It is provided by G. L. c. 151, § 12: " Any newspaper refusing or neglecting to publish the findings, decrees or notices of the commission at its regular rates for the space taken shall be punished by a fine of not less than one hundred dollars." Supplementary to this is § 13 of the same chapter: " No member of the commission, and no newspaper publisher, proprietor, editor or employee thereof, shall be liable to an action for damages for publishing the name of any employer as provided for in this chapter, unless such publication contains some wilful misrepresentation."

The particular charge in the case at bar is that the defendant refused to publish a " finding " of the minimum wage board. The record shows that a letter was sent to the defendant with the request to " publish the accompanying

advertisement " on a specified date.   The complaint shows
that this " accompanying advertisement " was introduced
by these words:  " The Minimum Wage Commission hereby
gives notice " that a named employer of labor was not
complying with its recommendation as to minimum wages
to be paid to women in its service, together with a statement
of those recommendations, the unanimity of conclusion
reached by the wage board and the obligation imposed on
the commission under such circumstances.   No argument
has been made that this was not in conformity to the statute.
That question is not considered.   It is assumed in favor of
the Commonwealth.   The defendant refused to comply with
the request of the minimum wage commission for publica-
tion of the " accompanying advertisement " on the ground
of the questionable validity of the statute above quoted.

The only point to be decided is whether the mandatory
terms of the statute violate the rights secured to the defend-
ant by the Constitution.   The question expressly left open
in *Holcombe* v. *Creamer*, 231 Mass. 99, 111, 112, is now
presented for decision.

There appears to us to be nothing in the decision in *Adkins*
v. *Children's Hospital*, 261 U. S. 525, which requires a modi-
fication of the decision or the reasoning in *Holcombe* v.
*Creamer*, 231 Mass. 99, wherein the main features of our
minimum wage law were upheld.   The statutes under con-
sideration in these two decisions differ radically in a funda-
mental provision.   Our statute, now G. L. c. 151, contains
no compulsion as to the payment of any rate of wages but
leaves that subject wholly to the voluntary act of employer
and employee.   It merely affords machinery for inquiry by
a public board touching the rate of wages which women and
children in a particular occupation ought to receive " to sup-
ply the necessary cost of living and to maintain the worker
in health," and for making public the results of that inquiry.
It resembles in its constitutional features the act of Congress
upheld in *Pennsylvania Railroad* v. *United States Railroad
Labor Board*, 261 U. S. 72.   The statute before the court in
*Adkins* v. *Children's Hospital*, 261 U. S. 525, made compul-
sory upon both employer and employee such rate of wages

when so ascertained. All that was decided in *Holcombe* v. *Creamer* stands and must be accepted as the basis of the present adjudication.

Section 12 of the statute now under consideration is not in terms permissive. It is penal. Its effect is to render liable to criminal prosecution with severe fine every publisher of a newspaper refusing to print as therein required. It imposes a strong coercion. As a practical matter it cannot be resisted by a law abiding publisher. It is in substance a mandate from the Commonwealth. If valid, it must be obeyed by all coming within its sweep.

This mandate of the sovereign is that the publisher of a newspaper must print the " findings, decrees or notices " of the minimum wage commission. The meaning and scope of these words must be ascertained from other parts of the chapter. In § 4 occur the words " decree of its findings " as descriptive of the decision of the commission concerning minimum wages which ought to be paid under the act and of its ascertainment of facts as to acceptance of its recommendations by employers and as to the names of employers following or refusing to follow such recommendation. " Decrees " is found in § 14. In this context that word signifies nothing more than recommendation, suggestion, determination or finding of fact. " Findings " means ascertainment of facts, the reasons therefor and expressions of opinion on the subject of minimum wages and matters germane, ancillary and subsidiary thereto. In §§ 2, 4 and 14 is the word " notices," indicating notifications to parties interested, either employers or employees, of proposed hearings or of decisions reached.

The effect of the statute is to compel the publisher of any newspaper, selected by the public board established by the statute, to print the matter offered by that board in accordance with the statute at the rate specified in the statute. The publisher has no option. He must print. He cannot negotiate as to the rate he will charge. His regular rate to the general public for space fixes the price to be paid to him. He can receive no more. The contract to publish at that price is imposed upon him as an absolute obligation by the

simple request of the public board. He may be the only owner of a newspaper so requested. He may not want to print the designated matter at the rates commonly charged for space. It may not be for his business advantage so to print it. He may not want to print it at any price. His preferences, desires or financial advantage or detriment are entitled to no consideration under the statute. This class of advertising may be peculiarly onerous. It may be especially disagreeable from a business standpoint. Its fair market value, regarded as space occupied, may be much greater than the price commonly charged for business advertisements of the usual character. Conditions can readily be conceived where these factors would exist. No one of them or others of kindred nature can be weighed under the terms of the statute. The proprietor of the newspaper selected by the public board must publish at the stated price, no matter how great may be the practical loss to him.

The protection afforded to the publisher by § 13 against liability for libelous publications made pursuant to the mandate of § 12 is of uncertain nature. The constitutional power of the Legislature to deprive one altogether of 'his right of action against the publisher of a libel may well be open to doubt. The right of speedy remedy for injuries or wrongs to character is established and preserved on the same footing as injuries or wrongs to person and property by art. 11 of the Declaration of Rights. *Ellis* v. *Brockton Publishing Co.* 198 Mass. 538, 543. *Park* v. *Detroit Free Press Co.* 72 Mich. 560, 564, 567. *Hanson* v. *Krehbiel,* 68 Kans. 670. *Post Publishing Co.* v. *Butler,* 71 C. C. A. 309. Compare *Allen* v. *Pioneer-Press Co.* 40 Minn. 117.

Without attempting to determine the meaning of § 13 and the extent of its shield to a newspaper publisher printing libelous matter, it is at least plain that such publisher may be involved in expensive litigation which he would not invite or risk if left to his own volition. The power to impose contracts involving consequences of that kind cannot in any event be rested upon considerations, the exigent nature of which is not plain.

No discussion is required to demonstrate that § 12 curtails in substantial particulars the right of the publisher of the newspaper to contract about his affairs.

" The right to acquire, possess, and protect property includes the right to make reasonable contracts, which shall be under the protection of the law." *Commonwealth* v. *Perry*, 155 Mass. 117, 121. Freedom of contract in its constitutional sense is secured by several provisions of the Constitution of this Commonwealth. Declaration of Rights, arts. 1, 10, 12. The right to make contracts with respect to property upon terms mutually stipulated by the parties thereto is included " in the right of personal liberty and the right of private property — partaking of the nature of each." *Coppage* v. *Kansas*, 236 U. S. 1, 14. *Bogni* v. *Perotti*, 224 Mass. 152, 155. Freedom of contract is not absolute. It is subject to reasonable legislative regulation in the interest of public health, safety and morals and, in a sense not resting merely on expediency, the public welfare. Valid statutes imposing limitations upon freedom of contract find numerous illustrations in our own decisions and those of the United States Supreme Court. Many of them are collected and reviewed in *Holcombe* v. *Creamer*, 231 Mass. 99, 104-107. So also *Opinion of Justices*, 247 Mass. 589; *Prudential Ins. Co.* v. *Cheek*, 259 U. S. 530; *National Union Fire Ins. Co.* v. *Wanberg*, 260 U. S. 71; *Radice* v. *New York*, 264 U. S. 292. " While there is no such thing as absolute freedom of contract and it is subject to a variety of restraints, they must not be arbitrary or unreasonable. Freedom is the general rule and restraint the exception. The legislative authority to abridge can be justified only by exceptional circumstances." *Wolff Packing Co.* v. *Kansas Court of Industrial Relations*, 262 U. S. 522, 534.

The case at bar falls within the general rule. It is not an exception to it. There is nothing about the present statute which indicates a temporary emergency. It is not limited in time but permanent in scope and operation. Cases like *Wilson* v. *New*, 243 U. S. 332, *Block* v. *Hirsh*, 256 U. S. 135, *Marcus Brown Holding Co.* v. *Feldman*, 256 U. S.

170, are inapplicable where statutes were upheld on the ground of stress of public need which appeared to be likely to pass. See *Chastleton Corp.* v. *Sinclair*, 264 U. S. 543.

The statute was not enacted under the pressure of war conditions, where perhaps some concessions may be made to the necessities of government not likely to be recognized in times of peace. *Lajoie* v. *Milliken*, 242 Mass. 508, 522.

There is nothing in the record to indicate that the public board did not have ample opportunity to print its notice in other newspapers than that published by the defendant at the statutory price. It does not appear that there is a combination of newspapers to obstruct the publicity of government activities in this connection, or that there is any difficulty about procuring the adequate publications at reasonable rates. It is difficult, if not impossible in the present state of civilization, to imagine the existence of such conditions. It cannot be thought that the Legislature acted on such facts.

The statute cannot be supported as an amendment to the charter of the defendant. It is general in terms, applying both to individual and corporate publishers of newspapers.

Publishers of newspapers are subject, of course, to reasonable legislative regulations like all other citizens. Statutes in the interest of the public health, morals, safety and welfare affecting them are on the same footing as those affecting the generality of citizens. Very likely they might in this respect be made the subject of legislative classification for appropriate ends. See G. L. c. 223, § 45; c. 266, § 91; c. 221, § 47; c. 149, § 50; c. 136, § 6; c. 55, §§ 32, 33; c. 56, § 62. They have no special immunities. They do not constitute a privileged class. They are entitled to invoke constitutional guaranties in common with others.

It cannot be said on this record that newspapers are affected with a public interest so as to stand on a less favorable ground with respect to legislative regulation like the present than the ordinary person. In some circumstances the publishing of newspapers may perhaps be held to fall within the third class of business clothed with a public interest, so as to justify some public regulation, described in *Wolff*

*Packing Co.* v. *Kansas Court of Industrial Relations,* 262 U. S. 522, 535, in these words: " Businesses which though not public at their inception may be fairly said to have risen to be such and have become subject in consequence to some government regulation.  They have come to hold such a peculiar relation to the public that this is superimposed upon them.  In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly."  We do not need to pass upon that question further than to say that appropriate facts are not here disclosed to render that principle pertinent.  See *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543.

The legislative power as to price fixing and as to regulation, which recently was discussed and upheld with reference to theatres in *Opinion of Justices,* 247 Mass. 589, clearly does not reach to the facts here disclosed.  That opinion rested chiefly on historical grounds.

The case at bar does not fall within the principle of lawful impressment for public service.  There are collected in the brief of the learned counsel for the Commonwealth numerous colonial laws of that nature.  Perhaps the last statute of that kind which by penalty made compulsory the service of one elected a constable in towns, was repealed by St. 1918, c. 291, § 12.  *Hartley* v. *Granville,* 216 Mass. 38, 40.  *Butler* v. *Perry,* 240 U. S. 328.  It is manifest that the present statute was not enacted in reliance on that principle.  Its extent and pertinency to present conditions is open to doubt and need not be discussed.  It does not support the present statute.

It is fundamental that every presumption is made in favor of the validity of an act passed by the General Court. *Perkins* v. *Westwood,* 226 Mass. 268, 271, and cases there collected. But it cannot stand when violative of rights secured by the mandate of the people as expressed in the Constitution. Confining ourselves strictly to the present record, we are of opinion that §§ 12 and 13 of G. L. c. 151, violate rights of the defendant secured by the fundamental law and cannot be sustained.

The invalidity of these sections does not affect the rest of that chapter, which stands as a valid exercise of legislative power. *Holcombe* v. *Creamer*, 231 Mass. 99, 112. The defendant's motion for the direction of a verdict of not guilty ought to have been granted.

*Exceptions sustained.*